CLIFFORD A. BIGGERSTAFF ET AL., APPELLANTS, V.
ALICE OSTRAND ET AL., APPELLEES.

261 N. W. 2d 750

Filed January 25, 1978. No. 41285.

Tedd C. Huston, for appellants.

David B. Smith for Smith & Smith, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

WHITE, C. J.

This is an action in equity brought by the plaintiffs, coadministrators of the estate of Inez J. Ryan, deceased, on behalf of themselves and other heirs of Inez J. Ryan against Alice Ostrand in her capacities as administratrix of the estate of Earl H. Sharp, deceased, the conservator of the estate of Christina Sharp, and Christina Sharp, individually, seeking: (1) To set aside two deeds executed in 1959 by Inez J. Ryan conveying property to Earl H. Sharp on the

grounds that the deeds were without consideration and were executed as the result of undue influence by Earl H. Sharp upon Inez J. Ryan and to find a constructive trust in connection therewith; (2) to require an accounting of the rents and profits received by Earl H. Sharp from the properties conveyed to him in 1959 by Inez J. Ryan on the grounds that these rents and profits were the property of Inez J. Ryan and were converted by Earl H. Sharp to his use by being placed in a joint savings account in the names of Earl H. Sharp, Inez J. Ryan, and Christina Sharp, and to find a constructive trust in connection therewith; and (3) to have a resulting or constructive trust placed upon certain funds which were realized from the sale of real property owned by Inez J. Ryan and placed in a joint savings account in the names of Earl H. Sharp, Inez J. Ryan, and Christina Sharp.

The case was tried to the District Court. On October 5, 1976, at the close of plaintiffs' evidence, the District Court found, upon defendants' motion, that there was insufficient evidence to establish undue influence or conversion, and that plaintiffs' first and second causes of action should be dismissed. Defendants' motion to dismiss plaintiffs' third cause of action was overruled and trial continued. Following the presentation of their evidence, defendants renewed their motion to dismiss plaintiffs' third cause of action and that motion was taken under advisement. On October 8, 1976, the District Court found that there was insufficient evidence to establish a constructive or resulting trust and dismissed plaintiffs' third cause of action. Plaintiffs filed a motion for a new trial which was overruled and now appeal. We affirm the judgment of the District Court.

On appeal, plaintiffs contend that the District Court was in error when it dismissed their three causes of action on the basis that there was insufficient evidence to establish these causes of action. In an appeal in an equity action, it is the duty of this

court to try issues of fact de novo upon the record and to reach an independent conclusion thereon without reference to the findings of the District Court. Marfisi v. Spagnola, 197 Neb. 211, 248 N. W. 2d 24 (1976). However, when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of facts rather than the opposite. Pinney v. Hill, 191 Neb. 844, 218 N. W. 2d 212 (1974).

The record discloses the following: Inez J. Ryan was a widow. Her husband, Andrew, died in 1940. Her only son, Russell, died in 1956. Her closest relative was Earl Sharp, her brother, who was approximately 8 years younger than she. Earl lived with her and her husband until Earl married his wife, Christina, some time in the late 1940's. Earl and Christina married later in life and had no children. They lived in a house next door to Inez.

Inez' health deteriorated as she grew older. In 1967, an application was made for her to receive housebound benefits from the Veterans Administration. According to a doctor's report, dated October 30, 1967, accompanying the application, Inez was 82 years old, obese, and unable to stand straight unless she hung onto something. She was unable to feed, dress, or bathe herself without assistance. She was unable to climb steps or get in and out of a car without help. "Loss of memory varies, but has quite a bit of recent loss" the report indicated. In the late 1960's her eyesight started to fail until she could hardly see. Exhibit 32 was a diary made by her in 1966. This diary contains entries in which she complained of poor vision, bowel trouble, and various other aches and pains such as might be expected from an elderly person. She stopped coming into

the bank to conduct her banking business personally in 1966 or 1967.

As her health deteriorated, Inez relied more upon Earl to transact her business and upon Earl and his wife to take care of her. Christina cooked and laundered for her, and bathed and nursed her. A strong brother and sister relationship existed between Earl and Inez. Many nights Earl would stay at Inez' house, rather than his own, to tend to her needs. His care for Inez was such that it could even be said that he neglected his own wife in caring for Inez. Alice Ostrand testified that Earl was much more hesitant about placing Inez in a rest home that he was his own wife. Despite a few references in her diary about being "called down" now and then, the record reflects a good relationship between Earl, Inez, and Christina. Minnie Elliott, who occupied an upstairs apartment in Inez' home from 1946 until 1972, testified that there was "nothing but was good" between Christina and Inez. She testified that she never heard an argument between Earl and Inez or Inez and Christina. Alice Ostrand testified that, in her opinion, it was because of Christina's efforts that Inez was able to stay in her home as long as she did without having to go to a home. Earl died on January 5, 1973, and Inez died on February 4, 1973.

The two deeds in question were dated September 28, 1959, and recite consideration of "one dollar, love and affection." Gerald Thurman, a realtor in Broken Bow, testified that he prepared these deeds for Inez Ryan. He stated that he did considerable work for Mrs. Weiss, a relative of Inez, and that Inez would always come into his office with Mrs. Weiss. One day Inez asked if he could draw up some deeds for her and he said "yes." He asked her to bring in some old deeds in order to get the names and description correct. Inez said that this would be fine and returned about 2 weeks later with the old deeds.

Thurman stated that he prepared the deeds, he ac-

knowledged them, they were signed in his presence, and he gave them to her. Thurman testified that when they were fully executed, Inez made it clear to him what she wanted and there was nothing to suggest that she was mentally incompetent. At no time was Earl Sharp present during this transaction.

On April 15, 1971, a check was written in the sum of $10,000 to the Custer Federal Savings and Loan Association. On May 26, 1971, a check was written in the sum of $9,000 to the Custer Federal Savings and Loan Association. Both checks were from the joint account with rights of survivorship of Inez Ryan and Earl Sharp at the Nebraska State Bank and were typewritten and signed by Inez Ryan. These checks were used to purchase two savings certificates which were placed in the names of Inez Ryan, Earl Sharp, and Christina Sharp as joint tenants with rights of survivorship. Wayne Schmitz, secretary-treasurer of the Custer Federal Savings and Loan Association, testified that the signature cards on these two accounts, numbers 643-12 and 669-12, had the names of the three joint tenants typed out at the top, were given to Earl Sharp and were returned when properly signed. He stated that Earl Sharp handled the account and that he never dealt directly with Inez Ryan concerning this.

Introduced into evidence was a holographic will dated May 5, 1957, written by Inez Ryan, in which she directed that all of her worldly goods should go to "my only brother and sole heir Earl H. Sharp and to him alone." In 1967, she made another will, also placed in evidence, again giving all her property to Earl and appointing him executor of her will.

Earl C. Johnson, an attorney formerly in private practice in Broken Bow, testified by deposition that he handled Inez' legal business from 1967 until 1973. He did her 1967 will and income tax returns. He testified that he would see Inez professionally and socially from time to time. He stated that during

the period he knew her she had a sharp mind and was cognizant of what her brother was doing with the properties. He believed she had her own will, was resolute to do what she wanted, and was aware of current events and what was going on in the world.

Despite her physical disabilities, there was testimony by a number of witnesses, in addition to Johnson, who observed her and felt she never gave any indication of being mentally incompetent. Rather, she was sharp, not easily swayed, and knew what was going on at all times. The record contains testimony by various witnesses who stated they never observed anything which led them to believe Earl was trying to take control of his sister's property or assets.

There was ample testimony about the kind of man Earl Sharp was. Johnson testified that Earl was "a very honorable person." Fredrick Kottmeyer stated he never heard anything derogatory touching upon Earl's integrity, honesty, or fair dealing. Wayne Schmitz stated Earl had an exceptional reputation on all scores with the business community. Charles Giles testified Earl was honest and very much respected. Dr. Loren H. Jacobson said he never heard of anyone who did not think a lot of Earl Sharp. Pastor Richard C. Gayley testified Earl was an honest man. Ivan Coleman stated he had a high regard for Earl and that he conducted his and Inez' affairs in a good, business-like fashion.

Plaintiff Biggerstaff admitted the plaintiffs had withdrawn, from their amended petition, allegations relating to fraud by Earl Sharp because they did not want to cast any reflections upon Earl Sharp's name and their investigations disclosed none. Biggerstaff further stated that plaintiffs, after their examinations and investigations, found no evidence that Earl Sharp converted or appropriated, to his own per-

sonal use, funds belonging to his sister during her lifetime.

"To permit a finding of undue influence, it must appear by clear and satisfactory evidence that: (1) The grantor was subject to such influence; (2) the opportunity to exercise it existed; (3) there was a disposition to exercise it; and (4) the result appears to be the effect of such influence." Golgert v. Smidt, 197 Neb. 667, 250 N. W. 2d 628 (1977). The undue influence must be such as controls the will of the grantor. Guill v. Wolpert, 191 Neb. 805, 218 N. W. 2d 224 (1974). The plaintiff has the burden of proof to establish undue influence. McGowan v. McGowan, 197 Neb. 596, 250 N. W. 2d 234 (1977).

The mere existence of a confidential relationship does not void a conveyance. As a general rule the conveyance is valid if it appears that the grantor had competent or disinterested advice or acted voluntarily, deliberately, and advisedly, with full knowledge of the nature and effect of her act, and not because the confidential relationship influenced her. See Gaeth v. Newman, 188 Neb. 756, 199 N. W. 2d 396 (1972).

"A constructive trust arises from actual or constructive fraud * * * committed by one party on another. It arises if one person obtains the legal title to property from another by fraud or misrepresentation, or by an abuse of some influential or confidential relation which he holds towards the owner of the legal title * * *. When one of the foregoing situations is shown to exist by clear, satisfactory, and convincing evidence, the law constructs a trust in favor of the party upon whom the fraud or imposition has been practiced. Peterson v. Massey, 155 Neb. 829, 53 N. W. 2d 912. And, also, if a party obtains the legal title to property by virtue of a confidential relation, under such circumstances that he ought not, according to the rules of equity and good conscience hold and enjoy the benefits, a court of equity will

raise a trust by construction and convert the holder into a trustee of the legal title. Paul v. McGahan, 152 Neb. 578, 42 N. W. 2d 172.'' Musil v. Beranek, 160 Neb. 269, 69 N. W. 2d 885 (1955). See, also, 76 Am. Jur. 2d, Trusts, § 221, p. 446.

'' * * * a resulting trust has been defined to be one raised by implication of law and presumed always to have been contemplated by the parties, the intention as to which is to be found in the nature of their transaction, but not expressed in deed or instrument of conveyance.'' Campbell v. Kirby, 195 Neb. 610, 239 N. W. 2d 792 (1976). ''A resulting trust will not be declared upon doubtful and uncertain grounds; and the burden is upon the one claiming the existence of the trust to establish the facts upon which it is based by clear and satisfactory evidence.'' Holbein v. Holbein, 149 Neb. 281, 30 N. W. 2d 899 (1948). Where the alleged trust relationship is just as consistent with that of a gift or loan, courts will not ordinarily impress a resulting trust. Kula v. Kula, 181 Neb. 531, 149 N. W. 2d 430 (1967).

On a thorough review of the record, we conclude that the plaintiffs have failed to sustain their burden of proof on their three causes of action.

The judgment of the District Court is correct and is affirmed.

AFFIRMED.